IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

BRIAN STARKS, )
)
Petitioner, ) Case No. 3:11-0615
) Chief Judge Haynes
v. )
)
JOE EASTERLING, Warden, )
)
Respondent. )

**MEMORANDUM**

Petitioner, Brian Starks, filed this pro se action seeking the writ of habeas corpus to set aside his state convictions for first-degree murder and attempted aggravated robbery. Petitioner received a life sentence with parole for the first degree murder conviction and 11 years for the armed robbery conviction. After a review of the pro se petition, the Court appointed the Federal Public Defender to represent Petitioner. Petitioner filed two amended petitions. (Docket Entry Nos. 20 and 22). In earlier proceedings, the Court denied Respondent's motion to dismiss without prejudice in light of the second amended petition to renew. (Docket Entry No. 36). Petitioner filed a third amended petition (Docket Entry No. 34).

In his third amended petition (Docket Entry No. 34), Petitioner presents the following claims: (1) that in multiple instances, his trial counsel provided ineffective assistance of counsel; (2) that the State knowingly presented false testimony at Petitioner's trial; (3) that the State prosecutor withheld exculpatory evidence; (4) that the State's proof was insufficient to support his convictions; and (5) that the trial court's sentence of Petitioner, a minor, to life plus 11 years constitutes cruel and unusual punishment and violates the Eighth Amendment in light of Miller v.

1

Alabama, _ U. S. _, 132 S. Ct. 2455 (2012).

Before the Court is Respondent's renewed motion to dismiss (Docket Entry No. 42) contending, in sum, that this action is time barred and that Petitioner's claims lack merit or are unexhausted and procedurally defaulted. In response, Petitioner invokes the doctrine of equitably tolling citing his youth and mental condition and argues that the Miller decision is retroactive and therefore his Eighth Amendment claim is timely. Petitioner also asserts that his Brady/Giglio claims are timely because those claims were filed within a year of Petitioner's discovery of the factual bases for those claims. Finally, Petitioner relies on Martinez v. Ryan, 132 S.Ct. 1309, 1315 (2012) as entitling him to a hearing on his ineffective assistance of counsel claim. The Court set an evidentiary hearing on the tolling issue.

## A. Review of the State Court Record

### 1. Procedural History

On September 11, 2001, a Davidson County Criminal Court jury convicted Petitioner of first degree murder and attempted especially aggravated robbery for which Petitioner was sentenced to life on the murder conviction and eleven (11) years sentence on the attempted robbery conviction to run consecutively. On appeal, Petitioner's conviction and sentences were affirmed. State v. Starks, No. M2002-179-CCA-R3-CD, 2003 WL 1877084 (Tenn. Ct. Crim. App. Apr. 15, 2003). Petitioner did not apply to the Tennessee Supreme Court for permission to appeal

On October 5, 2009, Petitioner filed a state habeas action that the state trial court denied. (Docket Entry No. 43-11 at 8, 79-81). On appeal, the Tennessee appellate court dismissed the appeal as untimely. (Docket Entry No0. 46-1 at 2; Starks v. State, No. M2009-2618-CCA-R3-HC (Tenn. Ct. Crim. App. Feb. 9, 2011)). Petitioner filed this action on June 21, 2011.

## 2. State Court Findings of Fact

In Petitioner's direct appeal, the Tennessee Court of Criminal Appeals made the following findings of fact:

> On January 18, 1999, the defendant, armed with a pistol, and two codefendants attempted to rob Julius Talley. After discovering that the victim did not have any money, the defendant shot the victim four times, killing him, and then fled.
>
> At trial, Xavier Gray, a codefendant, testified that on January 18, 1999, he spent the day with the defendant, Dewayne Hooten, and Andrew Jefferson, another codefendant. They drove to the Rivergate Mall in a car the defendant had "pawned" FN1 earlier that day. Before going inside the mall, Gray saw the defendant put a gun under the seat of the car. Subsequently, the four men returned to their neighborhood on Settle Court in the Sam Levy Housing Development where they began drinking gin and beer, smoking marijuana, and selling crack cocaine. The victim came to the neighborhood to buy drugs, first approaching Hooten and then the defendant. Travis Lawless, whom Gray identified as their "supplier," drove up, and the victim and the defendant went inside Lawless' residence with him, with Jefferson remaining outside.
>
> > FN1. Gray defined "pawned" as when a crack addict says, "You can keep my car for so many days for this amount of drugs."
>
> Gray and Hooten then walked down the street to buy marijuana; when they returned, the defendant and the victim had come outside and Gray saw the defendant hand a gun to Jefferson. Holding the victim's shirt with his left hand and pointing a gun at the victim with his right hand, Jefferson told the victim, "I just want the money or the dope." The victim responded, "I ain't got no drugs. I don't have no money." Angered that the victim did not have any money or drugs, the defendant took the gun from Jefferson and told Jefferson and Gray to take the victim ten to twelve feet across the street to a dumpster. At the dumpster, the defendant repeatedly said, "I'm gonna kill him," as the victim begged for his life. The victim tried to run twice but was pushed back against the dumpster, first by Jefferson and then by Gray. As Gray and Jefferson turned to walk away, Gray heard a gunshot, turned back around, and saw the victim holding his hip and trying to run. The defendant then fired three or four more shots at the victim who ran to Lawless' yard where he collapsed.
>
> Gray testified that he, the defendant, Hooten, and Jefferson then fled the scene, driving to the home of Patrice Woodland, the defendant's girlfriend. Jefferson asked the defendant why he had shot the victim, and the defendant replied, "I wish I wouldn't shot him." At Woodland's house, the defendant wrapped the gun in a pillowcase and took it to the back

3

of the house. After taking Jefferson home, the defendant, Hooten, and Gray returned to Woodland's house where they spent the night.

Approximately two weeks later, the defendant "got caught on a violation of probation" and called Gray, instructing him, "Don't say nothing. You gonna beat this with ... lack of evidence. So, if they come and ask for y'all, just be quiet. Don't say nothing about it." Gray admitted that he was untruthful at first when he was questioned by police but later told the truth and was then locked up at the Davidson County Juvenile Detention Facility. While confined there, he received a letter on his dinner tray from the defendant. Although the letter was not signed by the defendant, Gray knew it was from him because: it was addressed to "X-man," Gray's nickname; it mentioned "Drew" (Andrew Jefferson) and "Wayne-Wayne" (Dewayne Hooten); it discussed the shooting, referring to the victim as "Dude"; and it was signed "Your folks," which is the way Gangster Disciple members greeted each other. Gray said that both he and the defendant were members of the Gangster Disciples. The letter also mentioned the name of the defendant's attorney and told of "a deal" this attorney could get for Gray if he remained silent about the defendant's participation in the shooting. To explain why the defendant's fingerprints were found on the gun, the letter instructed Gray to say that the defendant bought the gun from Jefferson for $200 after the victim was killed with it. After the letter was entered as an exhibit, Gray was permitted to read it aloud to the jury.

Patrice Woodland testified that the defendant, Gray, Jefferson, and Hooten came to her house on January 18, 1999. The defendant gave her a gun and told her to "[h]old it till he came back." She said that she initially put the gun in a clothes hamper, but gave it to her mother the next day because she had small children at home. When questioned by the police a few days later, she told Detective Roy Dunaway that she had given the gun to her mother. Sara Woodland testified that her daughter, Patrice Woodland, had given her the gun, but she traded it for a gram of crack cocaine. She later was able to recover the gun from the person she traded with and turned it over to the police.

The State also called Dewayne Hooten to testify, but, while on the stand, he became uncooperative and was declared a hostile witness. During his testimony, his memory had to be refreshed several times with the prior statement he had given to the police. He testified that he was at the scene of the shooting but could not remember exactly what happened. He saw the defendant, Jefferson, Gray, and others walk around the corner and heard shouting and gunshots. He also testified that he drove them from the scene to the home of Patrice Woodland. When asked if he remembered telling the police in his statement that the defendant had said, "I wish I hadn't shot [the victim]," Hooten replied that he did not remember who said it.

Officer Johnny Ray Crumby, Jr., of the Nashville Metro Police Department testified that he and another officer were dispatched to the shooting at 325 Settle Court. When he

arrived, emergency medical workers were already there, rendering medical assistance to the victim who was lying on the ground. Crumby secured the crime scene and looked for physical evidence but did not find any. He questioned people at the scene but "didn't locate anybody that knew anything."

Officer Jeffrey P. Odom, a crime scene technician with the Metro Police Department, testified that he was dispatched to the scene of the shooting at approximately 11:15 p.m. The only physical evidence found at the scene was the victim's clothing which had been cut off by emergency medical workers. After making photographs of the scene, Odom returned to the field office but was summoned by detectives at 3:30 a.m. to return to the scene. On his second visit to the crime scene, he collected a zipper clasp found on the ground near the 325 Settle Court building and photographed drug scales and a high-powered rifle found in one of the apartments. On cross-examination, Odom said he did not remember looking for fingerprints on the rifle or scales because they had already been handled by other persons. He testified that the surface area of the zipper clasp "was so small and so porous, that we wouldn't have had consistent ridge detail ... to get a fingerprint that woulda [sic] been identifiable."

Detective Roy Dunaway of the Metro Police Department testified that he investigated the crime scene and found blood near the front porch of 325 Settle Court, a portion of a zipper, clothing removed from the victim, and a set of drug scales from the residence at 325 Settle Court. By the following day, he had uncovered the nickname of "Little B" and the first name "Brian" from people in the area. After speaking with Travis Lawless and Kimberly Williams who lived at 325 Settle Court, Dunaway was given the defendant's name. He subsequently interviewed and was involved in the arrests of the defendant, Jefferson, and Gray. Dunaway also took statements from Dewayne Hooten, Patrice Woodland, and Sara Woodland, from whom he recovered the murder weapon. He was also present during the victim's autopsy and testified that three bullets were recovered from the victim's body, as well as a small plastic bag containing several rocks of crack cocaine from the victim's rectum. The bullets and the gun were sent to the Tennessee Bureau of Investigation ("TBI") Crime Lab for examination.

Dr. John E. Gerber, the medical examiner who performed the autopsy on the victim's body on January 19, 1999, testified that the victim sustained four gunshot wounds, one to the left lower back, one to the left flank, and two to the left thigh. Three bullets were recovered from the wounds, and blood tests revealed the presence of cocaine in the victim's body. Dr. Gerber also found a plastic bag containing a white substance in the victim's rectum.

TBI Special Agent Shelley Betts, a forensic scientist assigned to the firearms identification unit, testified that she examined the revolver FN2 and the three bullets sent to her by the Metro Police Department and determined that the bullets recovered from the victim's body had been fired in the revolver.

5

FN2. Agent Betts's report identified the revolver as a Smith and Wesson .38 special.

Detective Dunaway further testified that he took Gray's statement a few days after the shooting and was present when Gray testified at the defendant's transfer hearing approximately five months later in June 1999. After being recalled to testify as a defense witness, Dunaway FN3 related inconsistencies in Gray's statement and his testimony at the transfer hearing. In his statement, Gray had said he followed the defendant, Jefferson, and the victim across the street, but, at the transfer hearing, he admitted that he took the victim by his sleeves and pulled him across the street. Gray further admitted at the transfer hearing that he knew he was taking the victim across the street to be robbed. At one point in his testimony at the hearing, Gray said he had heard what the defendant said to Jefferson but later testified he had not heard their conversation. Despite these inconsistences, however, Dunaway said that Gray's testimony at the hearing about the defendant having the gun all day and shooting the victim was consistent with what Gray had said in his statement.

FN3. In the interim, Detective Dunaway had reviewed Gray's statement and apparently an audiotape of the defendant's transfer hearing.

Following the testimony of Detective Dunaway, the defense rested its case in chief.

Starks, 2003 WL 1877084 at *1-4.

## B. The Federal Habeas Hearing

At the evidentiary hearing in this action, Dr. Lyn McRainey, a psychologist testified that she reviewed Petitioner's school records, treatment records, institutional records as a juvenile and his state presentence report. Dr. McRainey also conducted three and one half hours of interview and psychological testing of Petitioner. According to Dr. Rainey, Petitioner's mental health history includes a diagnosis and assessment in the sixth grade that Petitioner suffered from an emotional disturbance disorder and with an IQ of 72 was rated with mild mental retardation. Petitioner also suffered from major depression that caused him to withdraw from others and impaired his ability to form relationships. A subsequent IQ test revealed a score of 81, but at age

6

14, Petitioner was placed at the Hawks Institute for treatment and after 10 months, Petitioner met his treatment goals and was released.

Dr. McRainey's testing measured Petitioner's IQ at 86 that is in the low average range of intelligence. Petitioner reads at the fourth grade level. Of the several components of her testing, Dr. McRainey opined that Petitioner had a major depressive disorder and possessed poor executive function that impairs his abilities to prioritize and to meet deadlines, particularly if Petitioner experienced a prior failure on a particular matter. Dr. McRainey found Petitioner competent and noted that in the last couple of years, Petitioner had been taking Celexa that improved his mood, but would not impact his poor executive function. Petitioner did not understand his relationship with his prior counsel and their different responsibilities on legal matters. See Petitioner's Exhibit 1.

On cross examination, Dr. McRainey was unaware that Petitioner filed a seventy two page habeas petition, a motion to waive filing fees and a motion to ascertain status of his habeas proceedings. Dr. McRainey admitted that Petitioner was capable of filing a petition, but was uncertain if he could do so in 2004. Dr. McRainey explained that with the Celexa medication within the last couple of years or so, Petitioner had improved.

In addition, Petitioner asserts that his Brady/Giglio claims are timely because Petitioner filed his petition within one year of receiving the prosecution's file in early 2012 and discovering Xavier Gray's guilty plea to probation. Respondent contends that Gray's plea has been public record since September 21, 2001 and that Petitioner raised these misconduct claims involving Xavier Gray's testimony in his May 17, 2010, citing his pro se state habeas petition. (Docket Entry No. 42 at 4-5 and Docket Entry No. 46-2 at 2-4, 6).

7

## C. Conclusions of Law

### 1. Statute of Limitations

Respondent contends that Petitioner's claims for ineffective assistance of counsel and sufficiency of the evidence are time barred by 28 U.S.C. § 2254(d)(1)(A). Respondent cites Petitioner's direct appeal proceeding as concluding on June 14, 2003 after expiration of his time to apply for a review by the Tennessee Supreme Court. Thus, Respondent argues that the federal habeas statute of limitations commenced on June 15, 2003 and terminated on June 15, 2004. Respondent argues that Petitioner's untimely 2009 state habeas petition did not toll the federal habeas limitations period, citing Vroman v. Brigano, 346 F.3d 598, 602 (6th Cir. 2003). Thus, Respondent contends that this action that was filed on June 23, 2011 is time barred, including the claims in Petitioner's amended petitions.

The Antiterrorism and Effective Death Penalty Act ("AEDPA") that became effective on April 24, 1996, set a one year limitations period for habeas corpus actions. Under 28 U.S.C. § 2244(d)(1), a person convicted in state court has one (1) year from the time the conviction becomes final on direct appeal to file a federal petition. In Lindh v. Murphy, 521 U.S. 32 (1997), the Supreme Court held that the AEDPA was to be applied prospectively, i.e., beginning after April 24, 1996. In Brown v. O'Dea, 187 F.3d 572, 576-77 (6th Cir. 1999), the Sixth Circuit set a one year grace period from the Act's passage, i.e., midnight of April 23, 1997, for the filing of habeas petitions for state prisoners whose convictions were final. Accord Martin v. Jones, 969 F.Supp. 1058, 1061 (M.D. Tenn. 1997). Yet, where a federal habeas action is stayed pending exhaustion of state court remedies, the federal limitations period is tolled. Palmer v. Carlton, 276 F.3d 777, 781 (6th Cir. 2002). Aside from the "stay and abeyance" rule, the federal limitations

period can be equitably tolled under the Court's equitable jurisdiction. Souter v. Jones, 395 F.3d 577, 599-600 (6th Cir. 2005).

In addition, under 28 U.S.C. § 2244(d)(2), "the time **during which a properly filed application for State post-conviction** or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitations under this subsection." Id. (emphasis added). "The [statutory] tolling provision does not, however, 'revive' the limitations period (i.e., restart the clock at zero); it can only serve to pause a clock that has not yet fully run. Once the limitations period is expired, collateral petitions can no longer serve to avoid a statute of limitations." Vroman, 346 F.3d at 602 (quoting Rashid v. Khulmann, 991 F.Supp. 254, 259 (S.D.N.Y.1998)). "[A]n application for post-conviction relief is 'properly filed' within the meaning of § 2244(d)(2) 'when its delivery and acceptance are in compliance with the applicable laws and rules governing filings. These usually prescribe, for example, ... the time limits upon its delivery'." Id at 603 (quoting Artuz v. Bennett, 531 U.S. 4, 8 (2000).

The pendency of a federal habeas action does not toll the limitation period for filing of a federal habeas claim. Duncan v. Walker, 533 U.S. 167, 181-82 (2001). Under certain conditions, the relation back doctrine under Fed. R. Civ. P. 15(c)(2) can apply in a federal habeas action, but only to the extent that its application does not conflict with the AEDPA limitation period and the challenged claim is tied to the facts alleged in the original petition. Mayle v. Felix, 545 U.S. 644, 649 (2005).

As these principles are applied here, the Tennessee Court of Criminal Appeals rendered its decsion on direct appeal on April 15, 2003. Under Tenn. R. App. P. 11(b), Petitioner had sixty (60) days to file with the Tennessee Supreme Court his application for permission to appeal.

9

Petitioner did not do so and as a result, under Section 2244(d)(1)(A), his conviction became final on June 15, 2003 when his direct appeal concluded. By the time Petitioner filed his state habeas action on October 5, 2009, the Tennessee and federal habeas statutes of limitations had been expired for more than four years. Under Vroman, the untimely state habeas action did not toll the federal habeas statute of limitation. 346 F.3d at 602. Moreover, Petitioner's original petition lacks any factual allegations concerning his trial counsel's failure to advise him properly about the State's plea offer. Petitioner first asserted this claim in his second amended petition for writ of habeas corpus that was filed on March 13, 2012, well beyond the federal habeas statute. Thus, the Court concludes that this action is time barred unless Petitioner demonstrates that his mental condition establishes grounds for equitable tolling or that his Brady and Giglio claims were first discovered in 2012 or that Martinez applies to his claim that his trial counsel did not advise him on his guilty plea or that the 2012 decsion in Miller is retroactive.

## 2. Petitioner's Mental Condition

Equitable tolling is invoked where petitioner pursued his rights diligently and an extraordinary circumstance barred the filing of the habeas action. Holland v. Florida, 560 U.S. 631, 649 (2010). Equitable tolling applies only to "rare and extraordinary" cases. Souter, 395 F.3d at 590. In determining whether equitable tolling should be applied, a court must consider: (1) Petitioner's lack of notice of the filing requirement; (2) the Petitioner's lack of constructive knowledge of the filing requirement; (3) Petitioner's diligence in pursuing his rights; (4) absence of prejudice to the Respondent; and (5) the Petitioner's reasonableness in remaining ignorant to the legal requirement for filing his claim. Id. at 588 (quoting Dunlap v. United States, 250 F.3d 1001, 1008 (6th Cir. 2001)).

Equitable tolling is appropriate when the prisoner reasonably remains ignorant that the 365-day deadline has begun to run. See e.g., Miller v. Collins, 305 F.3d 491, 496 (6th Cir. 2002) ("From a litigant's perspective, it is a difficult, if not impossible endeavor, to estimate how long a reviewing court will take to decide a particular motion."). Yet, "ignorance of the law alone is not sufficient to warrant equitable tolling." Rose v. Dole, 945 F.2d 1331, 1335 (6th Cir. 1991). "Absent a satisfactory explanation for his failure to timely file his habeas petition," a habeas petitioner would fail to exercise due diligence in pursuing his claim and thus, would not be entitled to equitable tolling of the limitations period. Dunlap 250 F.3d at 1010.

For tolling based upon a petitioner's mental condition or incompetence, the habeas petitioner must make a threshold showing of incompetence and proof that his incompetence affected his ability to file a timely habeas petition. Nowak v. Yukins, 46 Fed. Appx. 257, 259 (6th Cir. 2002). As to the type of qualifying mental illness, in Ata v. Scutt, 662 F. 3d 736, 742, 745 (6th Cir. 2011), the habeas petitioner who had a long history of mental illness and schizophrenia and was found mentally incompetent, was held to have proved grounds to warrant an evidentiary hearing on his equitable tolling contention. Here, Petitioner was found mentally competent.

As to whether Petitioner's mild mental retardation and major depression qualify for equitable tolling, in Garner v. Mitchell, 557 F.3d 257, 263-66 (6th Cir. 2009) (en banc), the Sixth Circuit held that a habeas petitioner who presented expert assessments that he had "diminished mental capacity, a troubled upbringing and a poor education" as well as an IQ of 76 who was of borderline intelligence, was nonetheless competent to waive his Miranda rights. In Warren v. Lewis, 365 F.3d 529, 531, 532 n.2 (6th Cir. 2004), the Sixth Circuit expressed "grave

11

doubt" that habeas petitioner's IQ of 71 would justify equitable tolling. A habeas petitioner's mild mental retardation is not grounds for equitably tolling the limitations period in the absence of any indication that the mild mental retardation made him unable to manage his court filings or participate in the court proceedings. Pinchon v. Myers, 615 F.3d 631, 641-42 (6th Cir. 2010).

Here, Petitioner's latest test shows an IQ of 86 and prior to that his IQ was measured at 81. As to Petitioner's major depression and poor executive function, there is not any proof from Petitioner that he did not pursue any post conviction remedies until 2009 due to his depression. In 1998, Petitioner earned his General Equivalency Diploma and passed a course in auto mechanics. Petitioner's Exhibit No. 1, McRainey Report at 3). By 2001, the time of his trial, Petitioner was a member of a gang, the Gangster Disciples and tried to orchestrate the testimony of his co-defendant and gang member, Xavier Gray. (Docket Entry No. 43-2, Trial Transcript at 106, 112). Petitioner also had a girl friend. Id. at 99. Although Petitioner states his misunderstanding with his prior counsel, Petitioner did not testify at the hearing that he was unaware of the limitations periods for his state and federal habeas petitions. Petitioner filed a 2009 petition, years before commencement of his Celexa medication that is estimated to be within the last couple of years. Petitioner filed a 72 page pro se petition and motions. Based upon Sixth Circuit precedents, the Court concludes that petitioner has not satisfied the burden of showing the "rare and exceptional" circumstances to invoke equitable tolling.

### 3. Petitioner's Brady and Giglio Claims

Where a prosecutor withholds exculpatory material from the defense, the prosecutor violates the defendant's right to due process as established in Brady v.Maryland, 373 U.S. 83, 87 (1963). The Brady doctrine encompasses impeachment material. Giglio v. United States, 405

U.S. 150, 153-55 (1972). As to Petitioner's Brady and Giglio claims, AEDPA's one-year statute of limitations commences from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D). Discovery of Brady material may excuse a procedural default and render a habeas claim timely under Section 2244(d)(1)(D). Banks v. Dretke, 540 U.S. 668, 692-98 (2004). In such instances, "[t]he proper task ... is to determine when a duly diligent person in petitioner's circumstances would have discovered [the factual predicate behind his new-found evidence]." DiCenzi v. Rose, 452 F.3d 465, 470 (6th Cir. 2006) (quoting Wims v. United States, 225 F.3d 186, 190 (2d Cir. 2000)). Yet, where "a defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information' or where the evidence is available to defendant from another source", the Brady claim is time-barred. United States v. Clark, 928 F.2d 733, 738 (6th Cir.1991) (citations omitted).

Petitioner bears the burden of proving "'only due, or reasonable diligence'" rather than "'the maximum feasible diligence'." DiCenzi, 452 F.3d at 470 (quoting Granger v. Hurt, 90 Fed. Appx. 97, 100 (6th Cir. 2004) (internal quotation marks omitted)). Petitioner's assertions of due diligence must be supported by facts. Starns v. Andrews, 524 F.3d 612, 618 (5th Cir. 2008). Section 2244(d)(1)(D)'s due diligence requirement focuses "on the petitioner's responsibility to identify the factual basis for his habeas claim in [a] timely fashion." Earl v. Fabian, 556 F.3d 717, 727 (8th Cir. 2009). Once the factual predicate could have been discovered, the due diligence issue is moot, and the Petitioner simply has one year to file his federal habeas petition. Id.

Here, the threshold issue is the date when, by exercise of due diligence, Petitioner "could have discovered" the factual predicates for his Brady and related Giglio claims. Humphreys v.

13

United States, 238 Fed. Appx. 134, 139–40 (6th Cir. 2007); Aron v. United States, 291 F.3d 708, 711 (11th Cir. 2002), but see Rinaldi v. Gillis, No. 05–2101, 248 Fed. Appx. 371, 380 (3d Cir. 2007) (limitation period commences when the petitioner received the alleged Brady material). In Aron, the Eleventh Circuit explained the two-step inquiry for newly-discovered evidence claims:

> The government emphasizes that the one-year limitation period of [§ 2244(d)(1)(D) ] begins to run when the facts *could have been* discovered through the exercise of due diligence, not when they were *actually* discovered. This is indeed the language of the statute; the beginning of the one-year period is triggered by a date that is not necessarily related to a petitioner's actual efforts or actual discovery of the relevant facts. Of course, if a court finds that a petitioner exercised due diligence, then the one-year limitation period would begin to run on the date the petitioner actually discovered the relevant facts, because the dates of actual and possible discovery would be identical. But if the court finds that the petitioner did not exercise due diligence, the statute does not preclude the possibility that the petitioner's motion could still be timely under [ § 2244(d)(1)(D) ]. For example, if the court concludes that, with the exercise of due diligence, the relevant facts could have been discovered two months earlier than the petitioner (who it finds did not exercise due diligence) actually discovered them, then the motion would still be timely if filed within ten months of the date of actual discovery. Nonetheless, the court should begin the timeliness inquiry under [§ 2244(d)(1)(D) ] by determining whether the petitioner exercised due diligence because, as previously noted, if he did so, the limitation period would not begin to run before the date he actually discovered the facts supporting the claim.

291 F.3d at 711 (emphasis in original and footnote omitted).

The Sixth Circuit acknowledges the "reality of the prison system," Granger, 90 Fed. Appx. at 100, and that a State's misrepresentations may hinder a prisoner's due diligence search. Willis v. Jones, 329 Fed. Appx. 7, 16–17 (6th Cir. 2009). Yet, the habeas petitioner must be unaware of the basis of his claims, as required by § 2244(d)(1)(D), during the time prior to the running of the limitations period. Id.; Smith v. Bell, 381 Fed. Appx. 547, 552 (6th Cir. 2010); Starns, 524 F.3d at 619-21; Spirko v. Mitchell, 368 F.3d 603, 610-11 (6th Cir. 2004).

Here, whatever may have been learned in 2012, Xavier Gray testified for the State at

14

Petitioner's juvenile transfer hearing and trial after consulting with his counsel who represented Gray on charges of felony murder and especially aggravated robbery. (Docket Entry No. 43-2, Trial Transcript at 26-27, 30-31, 61). At trial Gray was asked, among other things, the following:

> Q. Mr. Gray, why are you testifying today?
>
> A. Because I hope I'm gonna deal in my case.
>
> Q. You're hoping for what?
>
> A. For a deal on my case.
>
> Q. Do you have a deal rught now?
>
> A, No. Sir.
>
> \* \* \*
>
> [cross examination]
>
> Q. Okay. Had you testified that the basis of your–what you are trying to do today is get a better deal
>
> A. Pretty much
>
> Q. And would it be fair to say that you're doing – willing to do whatever is necessary to get that deal
>
> A. No, if it was the truth ...

(Docket Entry No. 43-2 at 117-18 and Docket Entry No. 43-3 at 27). Gray's prior inconsistent statements about the events was elicited at trial (Docket Entry No. 43-2 at 102) and for his cooperation, Gray was released on bond. (Docket entry No. 43-2 at 118 and Docket Entry No. 43-3 at 27).

Upon review of the record, the undisputed facts are that at the time of his trial, Petitioner

15

was aware of the critical facts of Gray's <u>de facto</u> plea agreement with the State. In addition, Petitioner raised these claims, citing <u>Brady</u> and <u>Giglio</u> in his 2009 state habeas petition. "<u>Brady</u> does not apply when the defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information'." <u>Owens v. Guida</u>, 549 F.3d 399, 417 (6th Cir. 2008) citing <u>Coe v. Bell</u>, 161 F.3d 320, 344 (6th Cir 1998). The Court concludes that Petitioner's <u>Brady</u> and <u>Giglio</u> claims are time barred.

### 4. <u>Martinez</u> Claims

As a general rule, Petitioner's claims based upon alleged inadequacies of his trial and post-conviction counsel that are untimely, do not warrant equitable tolling for those claims. <u>Keeling v. Warden</u>, 673 F.3d 452, 462-64 (6th Cir. 2012). As to Petitioner's reliance on <u>Martinez</u> for equitable tolling, "<u>Martinez</u> lends no support to petitioner's argument that his initial habeas petition was entitled to equitable tolling based on his postconviction counsel's failure to comply with the AEDPA limitations period. As the Supreme Court noted in <u>Lawrence v. Florida</u>, 549 U.S. 327, 336–37 (2007), '[a]ttorney miscalculation is simply not sufficient to warrant equitable tolling, particularly in the postconviction context where prisoners have no constitutional right to counsel'." <u>Tucker v. Burton</u>, No. 99–CV–72263, 2014 WL 3894378 at *1 (E. D. Mich. August 08, 2014). The Court concludes that Petitioner's ineffective assistance claims are time barred.

### 5. Petitioner's <u>Miller</u> Claim

In <u>Miller</u>, the Supreme Court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments'." 132 S. Ct at 2460. This Court agrees that <u>Miller</u> represents a substantive

rule and is to be given retroactive application. See In re Morgan, 717 F.3d 1186, 1195-1202 (11th Cir. 2013) (JJ Wilson, Barkett and Martin, dissenting). This Court would also agree that Miller's rationale should extend to juveniles, such as Petitioner, who received state sentences that are the functional equivalent of a juvenile's life sentence without parole. Yet, in this Circuit, in Bunch v. Smith, 685 F.3d 546, 553 (6th Cir 2012), the Sixth Circuit held that Miller "did not address juvenile offenders, like Bunch, who received consecutive, fixed-term sentences for committing multiple nonhomicide offenses. Thus, even if we assume that Miller also applies to Bunch's case on collateral review, Bunch is still not entitled to habeas relief." Applying Bunch, the Court concludes that this claim cannot be the basis for habeas relief.

For these collective reasons, the Court concludes that the Respondent's motion to dismiss should be granted as most of Petitioner's claims are untimely and the timely Miller claim is not ground for habeas relief.

An appropriate Order is filed herewith.

ENTERED this the 2nd day of September, 2014

William J. Haynes, Jr.
Chief United States District Judge